My name is Jeremy Hollingshead and I represent the appellant Karen Beckley in this case. The case is a single count complaint after the dismissal of one other count. The count before this court is an FMLA retaliation count. The state of analysis in these cases is depending on whether or not there is direct evidence of discrimination or not. When there's no direct evidence of FMLA retaliation, the court is to use the same McDonnell-Douglas analysis that's used in effectively all other types of discrimination and retaliation cases. The court is, I'm sure, quite familiar with that analysis, but simply there's a three-step burden shifting process that takes place. The very first thing that has to happen is the plaintiff establishes a prima facie case for FMLA retaliation. If she does so, the burden shifts to the defendant company to come forward with evidence of a legitimate non-discriminatory reason for the adverse employment action. In that regard, the defendant company must meet this burden of proof by a preponderance of the evidence. In the event the company establishes that, the burden shifts back to the plaintiff to come forward with evidence creating the fact that the non-discriminatory reason was merely pretextual. With respect to the first step in this analysis, Ms. Beckley made a prima facie case for FMLA retaliation. In order to make such a case, she has to show by a preponderance of the evidence three things. First, that she engaged in an activity protected by the FMLA. Second, that she suffered an adverse employment action by her employer. And third, that a causal connection exists between the employee's protected activity and the employer's adverse employment action. At the onset, and to be clear, the first two elements for FMLA retaliation are not really in dispute in this case by the court or the defendant. As the first element, Ms. Beckley clearly engaged in activity protected by the FMLA. In fact, the defendant, in effect, is arguing that one of the reasons why this court should not reverse the lower court's decision granting summary judgment, because she was in effect on FMLA all the time with no interruptions thereto. In all, in fact, Ms. Beckley took four FMLA leaves. It's difficult to ascertain from the record when they started, when they ended. But as a matter of fact, there were four FMLA leaves, some intermittent, some continuous. And that distinction matters when we look at some of the case law cited in both parties' briefs. As the second element, Ms. Beckley unquestionably suffered an adverse employment action. In fact, she suffered several adverse employment actions in that she received several reprimands, both oral and written, right up after she applied for FMLA leave. And most obviously, her employment was terminated, and that is not in dispute. For practical purposes on this appeal, therefore, the case is really about the third element. That is, was there a causal connection between her protected activity of taking FMLA leave and the adverse employment actions identified a few moments ago? In KIPP v. Missouri Highway and Transportation Commission, this court noted that the, quote, is not but for causation, but rather a showing that an employer's retaliatory motive played a part in the adverse employment action. To that end, KIPP held that, quote, as to the types of evidence an employee can put forth to satisfy the causal connection requirement. In that regard, this court noted that an employee can make a causal connection through, quote, That is something that has become really the heart, almost, of both parties' briefs. So what does that mean? How far does the plaintiff have to go to prove that? And what additional evidence, if any, is required under what circumstances? Citing the Bassett v. City of Minneapolis, this court held in height that a pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement. Moreover, this court held that an escalation of adverse and retaliatory action by an employer can be used to, quote, Okay, so why don't you apply the law to the facts of this case and tell us what your position is? Sure. Well, Judge, in the present case, Ms. Beckley routinely suffered disciplinary action shortly following her exercise of FMLA. For example, in August of 2014, Ms. Beckley went on intermittent FMLA leave. The leave period began on or around August 4th of 2014 and ended on November 3rd of the same year. During the middle of this leave, on July 27th, 2014, Ms. Beckley was issued a level 2 warning by one of her supervisors, Ms. Babcock. Also during the leave, on August 25th of 2014, Ms. Beckley was issued a final warning by Ms. Babcock and another supervisor, Susan Miller, for an incident that allegedly occurred several weeks before, on August 2nd, 2014. On December 4th, 2014, just one month after Ms. Beckley's intermittent leave ended, she received a written reprimand regarding alleged concerns about basic surgical techniques and sterility, something that, prior to transferring to the operating room, she was not receiving such complaints. Prior to her request for FMLA leave, in fact, she didn't really receive any sorts of complaints. St. Luke's has argued that Ms. Beckley was doing a very different type of work previously, but the record before this court, Ms. Beckley's transcript from her deposition, shows otherwise, and that she was working in the labor and delivery unit, where she was often participating as a surgical technician in C-sections and other procedures related to labor and delivery. St. Luke's has noted no disciplinary action until Ms. Beckley was transferred to the OR sometime in 2013, and Ms. Babcock became her supervisor. She then again went out on FMLA leave, this time consecutive. Do you think it matters that she was on FMLA leave almost during the entire period of time that this was happening? That's a good question, Your Honor. I think it matters from the perspective of trying to apply a lot of this case law, because there really aren't any cases where that took place. I think that, in many ways, it makes it a little bit easier in the sense that it wasn't just one continuous leave. There were a series of a total of four of them. So it gives us a chance to see what's happening. But if we're to draw an inference of retaliatory intent, doesn't it cut against you that they continuously gave her FMLA leave? Well, I think, Judge, that she was entitled to that leave. I think that what happened, and I think an inference can be drawn, that over time they became very sick of it, that she continued to go out. Now, continuous leaves are one thing, but most of the time she was out, and, in fact, if you look at the disciplinary actions taken against her, it was when she was requesting oftentimes the intermittent leave coming up. She's coming off a leave, requesting intermittent leave. So what they know as an employer is she's going to be gone for periods of time. Can I jump ahead because your time is running short? Of course. They gave what appeared on the face to be a legitimate reason. So what's the evidence that their reason is pretextual? Judge, there's a few points in that regard, one of which is that we have additional evidence beyond just sort of that she's getting disciplinary actions. They're saying that it's because these different warnings were related to very specific things, one of which was that she didn't follow the on-call procedure. When Ms. Beckley explained that back in her deposition, she said, well, actually it was a supervisor who's not following protocol because I had a pager, hospital pager, that's how they get a hold of us, and she called my cell phone, and there's no guarantee a cell phone's going to be on or off, and it didn't have to be. The big one that happened related to this operating room procedure breakdown, where they alleged that she went to the bathroom for too long, that she got dirty, if you will, which means she broke sterility in the lab. And Ms. Beckley explained all of that back in numerous ways. She said nobody else was expected to not use the restroom during these procedures. It oftentimes lasts hours and hours and hours. There was no guarantee. It could be an hour. It could be 10 hours. She even asked her coworkers, is it okay if I leave, which they would do as well. They're not her boss, but the expectation was to make sure the room is good to go, and they leave on different breaks when there's not anything for them to do. So nobody else was getting in trouble for that. The sterility, she testified, happened all the time. The lack of sterility in the operating room may be disconcerting to those of us that might be in an operating room, but it just sounds like as a matter of reality that that's happening, and there are protocols in place to fix it. And really, according to Ms. Beckley's testimony, it doesn't take hardly anything in order to ensure the safety of the operating room for that to take place. Again, none of her coworkers were getting into trouble for that. So we have an issue, as the defendant's raised, well, we're not naming a specific individual. Well, in various cases cited in our brief, the Height case in particular, an individual wasn't named there either. It wasn't a specific individual. The big issue here is how connected they are to one another. And in that regard, Ms. Beckley testified that the doctors who they report to in the operating room. So in that operating room at all times, it doesn't matter what doctor it is, everybody in that room reports to that doctor. And everybody in that room has a different job, but they're all expected to do the job, and it's relevant and important to the operation that's taking place in that patient. So there's connectivity there, at least as much connectivity as we see in a lot of the other cases, where this court has said that that was sufficient. We also have more evidence beyond that. And the question is a falsity, right? Because this court has said that if it looks like on the face that what's being alleged in the proffered reason, nondiscriminatory reason, is false, that's a question of fact for the jury. In this case, Ms. Beckley testified that the two verbal warnings that are referenced in the defendant's brief never happened. She never received them at all. She also said that she talked with the operating room, with her supervisor, I should say, Ms. Babcock, about serality procedures following this incident. Nothing, no discussion about what happened. I think it's important to note that as big of a deal as they're making this sound, like it's a safety protocol violation, somebody could die. They waited 11 days before they actually terminated her. And during that 11 days, she testified she was in the operating room doing procedures. So all of this together, I think, you know, holistically, we look at the whole record when we're talking about whether or not the plaintiff satisfies her burden under McDonnell Douglas. Unique to this case, and understandably why there's so much debate about the application of it, is, as indicated, we have what seems like one continuous FMLA leave, but it's more than that. This case has pieces of all these other cases that are cited, and there's not really, as far as I can tell, a case directly on point that talks about all of these various things sort of happening all at once. Would you like to save any time for rebuttal, or do you wish to proceed? Yes, sir. I would like to. It's up to you, either way. I'll save my remaining time. I yield. Very well. Mr. Kaiser, we'll hear from you. Good morning, Your Honor. I'm here representing St. Luke's Episcopal-Presbyterian Hospitals in this matter. First, I'd like to answer a question that Judge Grunder asked specifically about the time that Ms. Beckley was on FMLA and the importance that that might play in this case. I think the record establishes that she was on FMLA for 21 of her 29 months while she was in this period, while she was in the operating room. The question really isn't whether she had ever been on FMLA. That's a given. The starting point in assessing the case is the well-settled law that eligibility for and taking FMLA doesn't necessarily insulate an individual in and of itself from what would otherwise be appropriate and legitimate personnel actions. So the fact that she was on FMLA for such a long period of time only makes it more likely that, yes, she did have protected activity, but it's only more likely that during that period of time there may be some kind of legitimate personnel action. That's why the courts have routinely said that temporal proximity alone is not sufficient to create the kind of causation that's needed for a prima facie case, let alone the kind of evidence which may be necessary for proving that the defendant's decision for making the ultimate decision was pretextual. I'd like to also address, Judge Colleton, your question about applying then the law as it stands to the facts of the case and the facts that were before the district court. The district court was perfectly appropriate for the district court to have reviewed these facts to make a determination, first as to whether there was a genuine issue of material fact, but more specifically because the plaintiff had so specifically relied on temporal proximity to understand the context and understand the meaning of whether temporal proximity actually was meaningful, whether there was a reasonable inference from it, or whether no reasonable inference could be drawn from it. The facts of this case indicate that, of course, that she was hired into the position while she was on FMLA, and not just hired into the position while she was on FMLA. She specifically volunteered to the hiring supervisor, Ms. Babcock, who also ended up being the person who terminated her. She said in her interview, I want you to know that I'm on FMLA. And according to Ms. Beckley, Ms. Babcock's response was, that's fine, that's not a problem. And then Ms. Babcock went ahead and hired Ms. Beckley. It's also clear that during the course of her employment, not only did Ms. Babcock never make any adverse comment about having taken FMLA, but even encouraged her on various occasions to take FMLA so that she could avail herself of her rights. It's true that when Mr. Hollingshead says, well, yes, but those were her rights. That's true, but the argument is that the supervisors were biased against her. And so I think her supervisors would take the exact same position, and that was her right. So that was perfectly fine. She had been continuously granted leave for FMLA, on and off, for virtually all of her tenure, 21 of her 29 months in the operating room. There was never an argument that she was given brief for taking any of her FMLA, that she was told that it was inappropriate. This case stands in stark contrast to the facts in Hyatt, where there was such egregious and overt hostility that was reflected by the supervisor in that case. It appears in Hyatt that virtually every chance that that supervisor had, they would take a stab and make threats based on an individual's use of FMLA. In this case, there's none of that. She argues, though, that prior to her increased use of FMLA, that she wasn't subject to any reprimands or disciplinary. Is that accurate? Well, I don't think that that's accurate, but not surprisingly, Your Honor, the record really doesn't delve into her treatment disciplinary or performance-wise while she wasn't in the operating room. And she was in a part-time position at the time she moved into the operating room. Why is that not surprising? I mean, why wouldn't the people defending the case try to respond to the argument that the discipline only started after the FMLA leave was taken? Well, the argument that the discipline only started after she was on FMLA came up in the briefing. It didn't come up in discovery. The argument was that... Where else would it come up? I mean, that's the whole point of discovery. I mean, you make the arguments in the briefing based on the evidence developed in discovery. So the specific allegation was that Ms. Babcock was biased against her because of her FMLA use. So the attention was paid on her treatment while she was in the operating room. She had different supervisors. She had different job requirements. And it was a period of 29 months. That's where the attention was paid. I don't think that it would be fair to say that her record indicates that she had no discipline. I think it would be fair to say that the record is silent as to what kind of discipline she may have had prior to the time that she came into the FMLA. I think it is also important that... that there is no prior disciplinary history. And we can't really talk about it because all you're doing at that point is asking us to speculate, right? I don't think it's a concession that there was no discipline. I think it would be true that we would be speculating as to whether there was prior discipline. Well, I mean, the other way to look at that is it's the plaintiff's burden. And if the plaintiff's trying to show an increase in discipline, maybe the plaintiff has to come forward with evidence of no discipline in the prior period. I suppose that's your... So I think it's an appropriate thing for us to focus on the discipline that she did receive while she was in the operating room to talk about this increase in discipline. First... Hold on. I cut off Judge Erickson. He had a follow-up question. Well, my follow-up question is really kind of jumping to another point because I'm kind of unfocused generally sometimes. But my question was they've made an argument essentially that the plaintiff disputes that there were any verbal warnings given and that the 11-day period between the time of the breaking of the sterility and the actual time that the termination took place, there being no suspension, that that's strong evidence of at least a question of fact on the issue of pretext. What would your response be to that? So I would say in the first instance that this case doesn't start with the final incident. It, of course, starts with her disciplinary record well before they ever had the final incident. And in a minute I'll spend a little bit of time talking about that because I think it is important. But secondly, an 11-day period of time to wait is not a lot of time given the fact... Well, first of all, there was no issue of life-threatening activity. There was a performance issue of an individual who had made her way through the progressive disciplinary process. It was then later reported to the supervisors about those activities. And rather than making a knee-jerk reaction to what was reported to them, they actually engaged in an investigation and interviewed people who were in the operating room, including Ms. Beckley. And so I don't think that an 11-day delay between the time that an event occurred, given the fact that it then has to be reported, they then have to schedule interviews, and there was no life-threatening issue that was present to them at the time, that an 11-day delay I don't think is unreasonable. I think that's actually really relatively a prompt response. I do think it's important to talk about the prior discipline, though, and how it is that Ms. Beckley found herself in this position where this event led to her termination. So the discipline that she received, and it was largely for not responding to calls. She would volunteer to be on call as a surgical technician, and it wasn't something that was imposed on the hospital by her. It was something she would volunteer. But in volunteering, you have to show up within a period of time, because it usually indicates that there's an unplanned or an emergency surgery taking place. And on these occasions, Ms. Beckley was called and sometimes did not respond at all, and sometimes responded too late. There's no dispute that these events actually did take place. So there's no dispute, for example, that she was called and she didn't come in. There's no dispute that each time that she was written up, that it was by a different supervisor. There's no allegation that any of those supervisors were biased against her because of her use of FMLA time. She has identified no one else who failed to comply with the on-call procedures, didn't respond at an appropriate time, and didn't get disciplined. So there's no example of a similarly situated individual who did the same thing and didn't get disciplined. And I think it's important to note that those actions are not the subject of this lawsuit. The subject of this lawsuit was the final event and her termination. So while it may be now that the claim is that, oh, well, those were all related to my FMLA, that is not what was pled in the lawsuit. What was pled in the lawsuit is that Ms. Babcock was biased against her because she took FMLA, not the series of all of these other supervisors on individual events, which there's no dispute that they actually did take place, and she did violate the rule. There was no sudden rush to judgment. The evidence also indicates that during the time she was on FMLA, her supervisors refrained from disciplining her for things that she acknowledged in her deposition would have been a big deal, in particular that she handed a surgeon a syringe that she had mislabeled. It included an anticoagulant instead of including water. And she indicated that, yes, this was a big deal. So what you have is, in the middle of all of this, you also have an excellent example of a time where, rather than indicating that her supervisors were looking for a way to terminate her for FMLA use, there was a time when they refrained from disciplining her. In the final event, there's no dispute that the surgical staff had reported what it is that she had done, that she was contaminated, that she entered the sterile field several times. She admitted that she – now, they interviewed her also. She admitted that she was contaminated to her supervisor. They reported that she took all of the – in the middle of the surgery, she took all of the surgical instruments off the preparation table in order to count them. In the middle of the surgery, she was counting the equipment and did not have them available for immediate use by the surgeon. She admitted this to her supervisor. She was gone from the operating room for at least 15 minutes in the middle of the surgery. Now, while she has explanations – I spent five minutes to go to the restroom to get a drink of water and ten minutes to re-scrub – she also has acknowledged that she could have re-scrubbed in a process that would have been perfectly acceptable that would have taken 30 seconds. She admitted that the normal amount of time that a person is away – certainly, people are allowed to take bathroom breaks – but the normal amount of time that people are away for a bathroom break is five minutes. The surgery proceeds. She's the surgical technician. It's not that she can't take a bathroom break, but the ultimate conclusion from the supervisors was, given her prior disciplinary record and what they had reviewed of her performance, that she had an uncomfortably cavalier attitude toward what are appropriate procedures to be followed in an operating room. This is exactly the kind of case that would be appropriate for when the courts say, we don't sit as giant personnel boards to make decisions. There's no evidence that the supervisors believe this information to be false, and there's no evidence that these supervisors who made this decision believed that – made this decision instead, not because they believed the reports, but because they had a discriminatory animus toward Ms. Beckley. There's no evidence of bad faith, and we would – I have 17 seconds, so I will defer by 17 seconds. Very well. Thank you for your argument. Would you care to make any rebuttal, Mr. Hollingshead? Yes, Your Honor. Go ahead. May it please the Court. Your Honors, I'd like to address just a couple points addressed by counsel for St. Luke's. First is really with this prior disciplinary history, which has become a big part of this case. The first thing I would say is I think that defense counsel hit on the issue already when he effectively conceded that this is not about the prior discipline up to the last event. I would say it is and it isn't. I don't think it helps them that there were these prior disciplinary incidents because I think those were part of the pretext that the argument Ms. Beckley is making. I do think that they're correct that the final straw was the last incident that supposedly took place in this operating room. She wasn't fired before that. We know that. So apparently that wasn't enough to do it. Then she was with respect to the operating room incident. So I think it's important to look at that incident in a bubble for purposes of what their nondiscriminatory reason that they have proffered is. But I think it's also important to look at the prior disciplinary incidents and the timing of them and the fact that Ms. Beckley is saying that two of them that they're claiming are in her file didn't even happen at all, which this court has discussed the padding of files and how that can lead to evidence, almost direct in a sense, that there is a reasonable fact finder could find that that proffered reason is in fact pretextual. So in explaining to the court, there are really two things going on there. It is relevant, but it helps Ms. Beckley. It's not helpful to them. And as explained before in my prior opportunity to speak with the court, first of all, there's no evidence that this had ever happened before. So opposing counsel keeps talking about she kept doing this, she kept doing this, and that her supervisors determined that she's just cavalier about procedure in the operating room. Where's the evidence of that before this court? From what I can tell, the evidence I've seen, there's one incident. And it's an incident that, giving all inferences to the plaintiff, she said had happened many times with many people, and they weren't disciplined. With that, I would ask this court to reverse the trial court's decision, and I thank you all for your time very much. Very well. The case is submitted, and the court will file an opinion in due course.